UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-cv-80645-MATTHEWMAN

UNITED STATES OF AMERICA, ex rel.
CLJ, LLC,

Plaintiff,

v.

DOREEN B. HALICKMAN, as Personal Representative of the ESTATE OF JACK F. HALICKMAN,

Defendant,
_______________________________________/

FILED BY SW D.C.
Jun 14, 2024
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - WPB

**ORDER ON DEFENDANT HALICKMAN'S MOTION FOR SUMMARY JUDGMENT [DE 125] AND PLAINTIFF RELATOR CLJ, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DE 131]**

**THIS CAUSE** is before the Court upon the following: (1) Defendant Doreen B. Halickman, as Personal Representative of the Estate of Jack F. Halickman ("Defendant Halickman" or "Halickman") Motion for Summary Judgment ("Motion for Summary Judgment") [DE 125] and Statement of Material Facts in Support of Motion for Summary Judgment [DE 126]; (2) Plaintiff Relator CLJ, LLC's ("Relator CLJ") Response in Opposition to Motion for Summary Judgment [DE 141] and Response to Defendant Halickman's Statement of Material Facts [DE 139]; (3) Defendant Halickman's Reply to Relator CLJ's Response in Opposition to Motion for Summary Judgment [DE 143] and Statement of Material Facts in Reply to Relator CLJ's Response to Defendant Halickman's Motion for Summary Judgment [DE 145]; (4) Relator CLJ's Motion for Partial Summary Judgment ("Motion for Partial Summary Judgment") [DE 131] and Statement of Material Facts [DE 130]; (5) Defendant Halickman's Response to Relator CLJ's Motion for Partial Summary Judgment [DE 138] and Statement of

Material Facts in Opposition to Relator CLJ's Motion for Partial Summary Judgment [DE 140]; and (6) Relator CLJ's Reply to Defendant Halickman's Response to Relator CLJ's Motion for Partial Summary Judgment [DE 146].

The Court held a hearing on the Motion for Summary Judgment [DE 125] and Motion for Partial Summary Judgment [DE 131] via Zoom Video Teleconference on March 28, 2024. The motions are fully ripe for review and the Court has carefully considered the parties' written submissions and the attachments thereto, the parties' oral argument during the March 28, 2024 hearing, the record, and the applicable law.

## I. <u>BACKGROUND</u>

On April 16, 2020, Relator CLJ filed a three-count complaint against Dr. Jack Halickman for violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. [DE 1 at 1]. Specifically, Relator CLJ alleges the following claims: False Claims Act: Presentation of False Claims, pursuant to 31 U.S.C. § 3729(a)(1)(A) ("Count I"); False Claims Act: Presentation of False Statements Material to False Claims, pursuant to 31 U.S.C. 3729(a)(1)(B) ("Count II"); and False Claims Act: False Record Material to Obligation to Pay, pursuant to 31 U.S.C. 3729(a)(1)(G) ("Count III"). *Id.* at 12–14.

On May 8, 2023, after the United States declined to intervene in this case, Defendant Halickman filed an Answer to the Complaint, along with seven affirmative defenses. [DE 77]. Following a hearing on March 28, 2024—and pursuant to a subsequent Order Granting Motion for Leave to File Amended Affirmative Defenses [DE 169]—on April 17, 2024, Halickman filed "First Amended Affirmative Defenses." [DE 170]. More specifically, Halickman withdrew three of her initial affirmative defenses and added two additional affirmative defenses with the Court's permission, for a new total of six affirmative defenses. The remaining affirmative defenses are

therefore as follows: that Dr. Halickman "did not knowingly fail to properly submit demands for payment to CMS" ("Second Affirmative Defense"); unclean hands ("Fifth Affirmative Defense"); Relator CLJ is not the original source ("Sixth Affirmative Defense"); lack of personal jurisdiction due to improper service ("Seventh Affirmative Defense"); that Relator CLJ's claims are barred by "claim/ issue preclusion / collateral estoppel" ("Eighth Affirmative Defense"); and that Accountable Care Options, LLC "is liable for any alleged fraudulent billing that may have occurred because of their failure to properly monitor billing, coding, provider status, credentialing, incident-to billing and other alleged errors, including Mr. Richard Lucibella's certification that all billing was truthful and accurate" ("Ninth Affirmative Defense"). *Id.* at 2–4.

## II. UNDISPUTED FACTS

The following facts are drawn from the uncontested portions of the record together with Halickman's Statement of Material Facts ("Halickman's SMF") [DE 126], Relator CLJ's Response to Halickman's Statement of Material Facts ("Relator's Response SMF") [DE 139], Halickman's Statement of Material Facts in Reply to Relator's Response ("Halickman's Reply SMF") [DE 145]; Relator CLJ's Statement of Material Facts ("Relator's SMF") [DE 130]; and Halickman's Statement of Material Facts in Opposition ("Halickman's Response SMF") [DE 140].

### A. FPIM

Family Practice & Internal Medicine of the Palm Beaches, LLC ("FPIM") was a family medicine group practice in Palm Beach Gardens, Florida. [Halickman's SMF ¶ 1; Relator's Response SMF ¶ 1; Halickman's Reply SMF ¶ 1; Relator's SMF ¶ 1]. FPIM was a "fee-for-service" practice, meaning that commercial insurers and Medicare reimbursed the practice for the individual services provided as coded by procedure codes known as "CPT Codes." [Relator's

SMF ¶ 2]. A majority of FPIM's patients were insured by Medicare, with Medicare accounting for the bulk of FPIM's revenue. [Relator's SMF ¶ 3]. From January 2005 until August 31, 2017, Dr. Jack Halickman, M.D ("Dr. Halickman"), owned and operated FPIM. [Relator's SMF ¶ 1]. To this end, prior to September 1, 2017, FPIM was a single member LLC with Dr. Halickman as its sole member. [Halickman's SMF ¶ 2]. However, on September 1, 2017, Dr. Halickman sold 90% of his interest in FPIM to Relator CLJ, LLC. [Halickman's SMF ¶ 31; Relator's SMF ¶ 9].

B. Dr. Halickman

Dr. Halickman was a licensed medical doctor in the State of Florida until his death on November 2, 2021. [Halickman's SMF ¶ 3]. As of 2021, Dr. Halickman had been practicing medicine for 36 years. [Relator's SMF ¶ 7]. However, at some point between 2004 and 2005, Dr. Halickman went on partial physical disability, began receiving disability insurance benefits, and limited his working hours to 20 hours per week until he resigned from FPIM. [Relator's SMF ¶ 8].

Dr. Halickman was credentialed with Medicare. [Halickman's SMF ¶ 4; Relator's Response SMF ¶ 4; Halickman's Reply SMF ¶ 4]. And, on or about August 21, 2012, Dr. Halickman entered into an agreement to submit his Medicare claims electronically. [Relator's SMF ¶ 4]. In this regard, in an Electronic Data Interchange Enrollment Application ("EDI Agreement"), Dr. Halickman agreed to "submit claims that are accurate, complete, and truthful." [Relator's SMF ¶ 5]. Moreover, in order to continue his enrollment with Medicare, on or about April 10, 2015, Dr. Halickman completed his Medicare Revalidation Application and certified, in part, that he agreed to abide by Medicare laws, regulations, and program instructions, and that he understood that the Medicare identification number issued to him could only be used by him or by a provider or supplier to whom he had reassigned his benefits under the current Medicare

regulations when billing for services rendered by him. [Relator's SMF ¶ 6]. Pursuant to Dr. Halickman's Medicare Revalidation Application, on or about April 10, 2015, Dr. Halickman re-enrolled with Medicare and such enrollment remained in place for five (5) years. [Halickman's SMF ¶ 4; Relator's Response SMF ¶ 4; Halickman's Reply SMF ¶ 4].

C. Additional FPIM Employees

Prior to September 1, 2017, FPIM's healthcare providers included Dr. Halickman, Steven Tureff, M.D., Lisa (Malloy) Joyce ("Ms. Joyce"), Catherine Dubois, and Terri Barr. [Relator's SMF ¶ 10; Halickman's Response SMF ¶ 10; Halickman's SMF ¶ 9]. Ms. Joyce is a Physician Assistant, who was employed by FPIM at all relevant times, and began working at FPIM in 2009. [Halickman's SMF ¶¶ 5–6; Relator's SMF ¶ 11]. Catherine Dubois ("Ms. Dubois") is a licensed Advanced Registered Nurse Practitioner, who was also employed by FPIM at all relevant times. [Halickman's SMF ¶ 7–8; Relator's Response SMF ¶ 7–8; Halickman's Reply SMF ¶ 7–8; Relator's SMF ¶ 10]. Ms. Barr, too, is an Advanced Registered Nurse Practitioner. [Relator's SMF ¶ 10].

As far as non-healthcare providers, from 2015 through 2020, Janet Eick was employed by FPIM as the Practice Manager. [Halickman's SMF ¶ 24; Relator's SMF ¶ 13]. In this capacity, Ms. Eick's responsibilities included oversight and processing of the billing of FPIM's Medicare claims, as well as the credentialing of FPIM's providers. [Relator's SMF ¶ 13]. While Ms. Eick submitted claims to the clearinghouse, it was Dr. Halickman and the non-physician providers who charted and coded their own visits. [Halickman's SMF ¶ 26; Relator's Response SMF ¶ 26; Halickman's Reply SMF ¶ 26]. Prior to Relator CLJ's purchase of membership interests in FPIM, Dr. Halickman was Ms. Eick's direct and only supervisor. [Relator's SMF ¶ 14].

D. Accountable Care Options and Primus Health Network

On September 3, 2014, FPIM joined an Accountable Care Organization named Accountable Care Options ("ACO"). [Halickman's SMF ¶ 12]. ACO and its partner, Primus Health Network ("Primus"), placed Victoria Clements (Rodriguez) ("Ms. Clements") in the FPIM office two to three days per month to review medical records and bills as part of the ACO program. [Halickman's SMF ¶ 13; Relator's Response SMF ¶ 13; Halickman's Reply SMF ¶ 13]. Although Ms. Clements is not a physician or provider, she was present on site at FPIM and would perform chart reviews to "look for coding opportunities on the diagnosis side on the supplemental code side to perhaps look at gaps in care." [Halickman's SMF ¶ 14; Relator's Response SMF ¶ 14; Halickman's Reply SMF ¶ 14]. This was because Ms. Clements was a professional coder, who was a member of Primus' billing department. [Halickman's SMF ¶¶ 17–18; Relator's Response SMF ¶ 18; Halickman's Reply SMF ¶ 18]. And, Ms. Clements had access to the entirety of the "patient chart." [Halickman's SMF ¶ 22].

Ramon Voils, too, was an employee of Primus. [Halickman's SMF ¶ 19]. Mr. Voils is Primus' Director of Finance—a position he has held since 2011. [Halickman's SMF ¶ 20; [Relator's SMF ¶ 27]. Mr. Voils is a certified medical coder. [Relator's SMF ¶ 28]. Mr. Voils' duties include overseeing the financial management of various medical practices, including FPIM. [Relator's SMF ¶ 27]. In this regard, Mr. Voils directed the work of Ms. Clements and the rest of the billing team. [Halickman's SMF ¶ 21].

To this effect, in early October 2017, Mr. Voils conducted a review of certain of FPIM's Medicare explanations of benefits ("EOB") with FPIM's practice manager, Ms. Eick, at FPIM's office. [Relator's SMF ¶ 29]. Upon review, Mr. Voils concluded that Dr. Halickman was

generally billing 24–28 hours' worth of patient encounters per day, based upon the "G-Codes" identified in the EOB's. [Relator's SMF ¶ 30; Halickman's Response SMF ¶ 30].

Around this same timeframe—that is, around early October 2017—Mr. Voils prepared and submitted the Florida Agency for Healthcare Administration ("AHCA") application for FPIM to be registered as a Healthcare Clinic. [Relator's SMF ¶ 31]. As part of the AHCA application process, Mr. Voils requested from Ms. Eick all of the providers' information, including their national provider identification ("NPI") numbers and provider transaction access numbers ("PTAN"). [Relator's SMF ¶ 32]. As part of this process, Mr. Voils eventually learned that the mid-level providers were not enrolled with Medicare. [Relator's SMF ¶ 33; Halickman's Response SMF ¶ 33]. And, as a result of not being enrolled with Medicare, the mid-level providers did not have a PTAN. [Relator's SMF ¶ 34]. Thus, at Mr. Voils' instruction, the mid-level providers were eventually enrolled with Medicare; specifically, Ms. Joyce was approved as a Medicare provider with an effective date of November 13, 2017, Ms. Dubois was approved as a Medicare provider with an effective date of June 23, 2018, and Ms. Barr was approved as a Medicare provider with an effective date of November 2017. [Relator's SMF ¶ 35].

Importantly, despite not being enrolled with Medicare originally, Dr. Halickman had the mid-level providers render care to Medicare beneficiaries, with the mid-level providers ultimately providing services to several thousand Medicare patients. [Relator's SMF ¶ 36; Halickman's Response SMF ¶ 36]. As part of these services, Medicare paid out $697,216.23 to FPIM for those claims. [Relator's SMF ¶ 38]. Or, stated differently, the Government reimbursed FPIM for the $697,216.23 in claims submitted to Medicare. [Relator's SMF ¶ 43].

After the sale of FPIM to Relator CLJ on September 1, 2017, FPIM remained in operation, and Dr. Halickman, Ms. Eick, Ms. Dubois, and Ms. Joyce continued in the same roles as before the sale. [Halickman's SMF ¶¶ 38–39]. In October of 2017, FPIM's new owners, too, determined—in their opinion—that Medicare was being billed incorrectly for incident-to services. [Halickman's SMF ¶ 40]. FPIM's new owners also opined that wellness visits were being billed incorrectly. [Halickman's SMF ¶ 41]. And, FPIM's owners concluded that certain services were "upcoded." [Halickman's SMF ¶ 42].

E. Claim Certification

When submitting a claim for payment to Medicare, the provider submitting the claim must certify that:

> In submitting this claim for payment from federal funds, I certify that: 1) the information in this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section.

[Relator's SMF ¶ 39]. Additionally, the Medicare Claim Form 1500 certification provides as follows:

> For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's

> offices, and 4) the services of non-physicians must be included on the physician's bills.

[Relator's SMF ¶ 40].

Prior to September 1, 2017, each provider at FPIM, including Dr. Halickman, was responsible for coding his or her own patient encounters, with Ms. Eick submitting the resulting claims to the appropriate insurer. [Relator's SMF ¶¶ 15–16]. In this regard, from at least 2009 and after the purchase of FPIM by Relator CLJ, FPIM utilized software known as eClinical Works ("ECW") as its electronic health record and practice management program. [Relator's SMF ¶ 17]. ECW contains a medical practice's patient information, insurance information, patient visit notes for all prior visits, all medical information received from other providers (hospitals, specialists, etc.), claim submission details, explanations of benefits, billing and payment details, and the daily schedule for each provider. [Relator's SMF ¶ 18]. In the patient visit notes, the providers input the various diagnosis codes ("MRA Codes") and CPT Codes applicable to each patient encounter which, in turn, generates the claim for submission to the applicable insurer. [Relator's SMF ¶ 19].

In ECW, there are two categories of patient providers: rendering providers, and resource providers. [Relator's SMF ¶ 20]. The rendering provider is the person under whom the claims or bills are submitted. [Relator's SMF ¶ 21; Halickman's Response SMF ¶ 21]. The resource provider is the person whom the patient is scheduled to see. [Relator's SMF ¶ 21; Halickman's Response SMF ¶ 21]. Prior to September 1, 2017, the ECW system was set up in such a way that Dr. Halickman was a rendering provider, while the non-physician providers were only resource providers. [Relator's SMF ¶ 23; Halickman's Response SMF ¶ 23]. To this end, it was Dr.

Halickman's practice to sign all non-physician providers' patient visit notes even when he did not see the patient. [Relator's SMF ¶ 25].

More specifically, prior to and after joining ACO in March of 2014, FPIM billed incident-to for certain examinations/treatment provided by mid-level providers. [Halickman's SMF ¶ 27]. Halickman contends that "[i]ncident-to is a Medicare approved billing method that allows the mid-level resource providers to examine/treat patients and bill the service under the NPI number of a physician provider." [Halickman's SMF ¶ 28]. Relator, CLJ, however, "disputes that . . . Halickman accurately identifies the requirements of incident-to billing." [Relator's Response SMF ¶ 28].

As part of the billing process, ACO did not submit FPIM's claims for payment. [Halickman's SMF ¶ 29; Relator's Response SMF ¶ 29; Halickman's Reply SMF ¶ 29]. Likewise, Richard Lucibella—the representative for Relator CLJ—did not submit claims for payment and did not review any claims prior to submission to determine accuracy. [Halickman's SMF ¶ 30, 32; Relator's Response SMF ¶ 30; Halickman's Reply SMF ¶ 30].

F. <u>Relator CLJ and Mr. Lucibella</u>

On September 1, 2022, FPIM sold its assets to CareMedica. [Relator's SMF ¶ 44]. Moreover, at some point, Relator CLJ's interest was assigned to Paladin Inc. (or the Paladin Trust), Girasol, LLC, and Vaina, LLC. [Halickman's SMF ¶ 33; Relator's Response SMF ¶ 33; Halickman's Reply SMF ¶ 33].

Notably, in addition to being the representative of Relator CLJ, Mr. Lucibella is the registered agent for Paladin, Inc. [Halickman's SMF ¶ 37; Relator's Response SMF ¶ 37; Halickman's Reply SMF ¶ 37]. In a similar vein, Mr. Lucibella holds an ultimate equity interest in Primus. [Halickman's SMF ¶ 35; Relator's Response SMF ¶ 35; Halickman's Reply SMF

¶ 35]. And, Mr. Lucibella is the registered agent for Primus. [Halickman's SMF ¶ 36; Relator's Response SMF ¶ 36; Halickman's Reply SMF ¶ 36].

Ultimately, Relator CLJ, on behalf of FPIM, self-reported to the Centers for Medicare and Medicaid Services ("CMS") overpayments made by Medicare to FPIM after the sale to Relator CLJ and made a voluntary repayment to the Government for those overpayments. [Halickman's SMF ¶ 48; Relator's Response SMF ¶ 48; Halickman's Reply SMF ¶ 48]. Once a lawsuit was filed against Dr. Halickman alleging false and fraudulent billing practices, Dr. Halickman testified that he had no knowledge of such practices. [Halickman's SMF ¶ 43; Relator's Response SMF ¶ 43; Halickman's Reply SMF ¶ 43]. Dr. Halickman also testified that Medicare never told him that he was not compliant. [Halickman's SMF ¶ 46; Relator's Response SMF ¶ 46; Halickman's Reply SMF ¶ 46].

## III. MOTIONS, RESPONSES, AND REPLIES

### A. Defendant Halickman's Motion for Summary Judgment [DE 125]

In Defendant Halickman's Motion for Summary Judgment [DE 125], Halickman begins by noting the elements of a claim under the False Claims Act—knowledge, causation, falsity or fraudulence of submitted claims, and damages. [DE 125 at 4]. In this regard, Halickman argues that no evidence has emerged throughout the discovery process to support any of these elements. *Id.* However, if the Court finds that just one of the elements lacks evidentiary support, Halickman notes that the Court should grant her motion and dismiss Relator CLJ's action with prejudice. *Id.*

Turning first to the scienter requirement, Defendant Halickman argues that, pursuant to *United States ex rel. Schutte v. SuperValue, Inc.*, 598 U.S. 739 (2023), the scienter requirement in a False Claims Act case "turns on the Defendant Halickman's subjective belief, not on what

an objectively reasonable person may have known or believed." [DE 125 at 5]. Indeed, Halickman argues that Relator CLJ cannot prove any of the three ways in which the knowledge requirement can be satisfied—actual knowledge, deliberate ignorance, or reckless disregard that such claims were false and fraudulent. *Id.* at 6.

With respect to actual knowledge, Defendant Halickman argues that "no statement in any deposition or correspondence indicates any witness's actual knowledge that Dr. Halickman subjectively knew or believed that FPIM was engaged in fraudulent (or even incorrect) billing." *Id.* at 7. Second, with respect to deliberate ignorance, Halickman argues that the evidence and testimony "demonstrates the exact opposite behavior," as Dr. Halickman immediately approached Ms. Eick (who handled billing) upon hearing that his billing practices were possibly erroneous, and "demanded that she confirm the truth of the matter, not once, but twice." *Id.* at 9.

Third, as to reckless disregard, Defendant Halickman notes that it is "very nearly indistinct from the language of that which defines deliberate ignorance, with the only meaningful difference being that deliberate ignorance requires the absence of any effort to investigate." *Id.* at 10. And in this regard, according to Halickman, "[i]t is not plausible that a physician made a careful point of hiring such an experienced billing expert, and then reasonably relied on her to provide accurate compliance information, if he simply did not care whether or not he was billing correctly." *Id.* at 11.

Next, turning to the causation requirement, Defendant Halickman notes that causation under the FCA is governed by the standard of proximate cause. *Id.* at 12. Halickman argues that the proximate cause requirement is satisfied if the conduct was "a substantial factor in inducing providers to submit claims for reimbursement" and if the submission of a false claim was

"reasonably foreseeable or anticipated as a natural consequence of Defendant Halickman's misconduct." *Id.*

To this end, Defendant Halickman argues that, "[a]lthough Dr. Halickman owned FPIM (until September 2017) and may well have profited from the billing of the midlevel providers thereof, Relator CLJ's complaint is devoid of any allegation of any action taken personally by Dr. Halickman himself which would have caused any of the alleged false claims to be presented." *Id.* at 13. Indeed, "[n]o evidence has come forward in discovery to suggest what action Dr. Halickman took to cause any false bill to be presented." *Id.* at 14. And, "Dr. Halickman reasonably entrusted his billing entirely to a qualified person who consistently believed that she was complying with all applicable laws relating to billing." *Id.* at 15.

Further, with respect to the falsity or fraudulence of submitted claims, Defendant Halickman argues that Dr. Halickman did not improperly bill for wellness visits provided by Midlevel Providers. *Id.* at 16. Defendant Halickman also argues that Dr. Halickman did not participate in upcoding. *Id.* at 17.

Moreover, Defendant Halickman argues that in December 2020, FPIM self-reported to CMS potential overpayments, and that CMS obtained accord and satisfaction of FPIM for the overpayments which are the subject of the present action. *Id.* at 18. And finally, Halickman argues that 31 U.S.C. § 3730(b)(4)(B), "so far as it authorizes a private litigant to maintain a qui tam action in which the United States has declined to intervene, is unconstitutional." *Id.* at 18–19.

B. <u>Relator CLJ's Response [DE 141]</u>

Relator CLJ begins by arguing that the undisputed evidence establishes the scienter requirement under the FCA. [DE 141 at 2]. According to Relator, "[t]he crux of Mrs.

Halickman's argument as to actual knowledge is that, because Dr. Halickman and Janet Eick *said* that they billed correctly, then it must be true." *Id.* However, Relator CLJ argues that in order to deceive Medicare, Dr. Halickman's practice "was to sign the patient visit notes of all his [non-physician providers], regardless of whether he saw the patient," which he knew was improper "because he certified in his Medicare Revalidation Application that he understood that, when billing for services he rendered, only he or a provider or supplier to whom he had reassigned his benefits under current Medicare regulations could use his Medicare identification number (PTAN)." *Id.* at 3.

Turning to reckless disregard, Relator CLJ argues that the deliberate ignorance standard does not allow a party "to deliberately turn a blind eye to reporting errors and then attest that, to its knowledge, they do not exist." *Id.* at 4 (quoting *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1178 (9th Cir. 2016)). Relator CLJ argues that Dr. Halickman's usage of his employees as a "buffer" is inconsistent with the purpose of the FCA, and that Dr. Halickman "can be held liable under the FCA for Eick's submissions." *Id.* at 5.

Relator CLJ next argues that Dr. Halickman's reliance on Ms. Eick does not "disrupt causation[,]" as a person "need not be the one who actually submitted the claim" for causation to exist. *Id.* at 6. In this regard, Relator CLJ argues that Dr. Halickman was an active participant in the false claims scheme by permitting his credentials to be used by "uncredentialed non-physician providers." *Id.* at 7.

With respect to the "wellness visits" referenced in Defendant Halickman's MSJ, Relator CLJ argues that no evidence exists in the record that Ms. Clements "directed" wellness visits. *Id.* at 8. As to "upcoding," Relator CLJ argues that its claims are not, in fact, based on upcoding. *Id.* at 9. As to Defendant Halickman's accord and satisfaction argument, Relator CLJ argues that it

is an unpled affirmative defense, is legally deficient, and does not apply to the bulk of Relator CLJ's claims. *Id.* at 9–10. And finally, Relator CLJ argues that Defendant Halickman's argument that qui tam actions are unconstitutional runs contrary to binding law. *Id.* at 10. Indeed, the United States filed a Statement of Interest Regarding Defendant Halickman's MSJ at DE 142, arguing that the FCA is constitutional.

C. <u>Defendant Halickman's Reply [DE 143]</u>

In the reply to her Motion for Summary Judgment, Defendant Halickman again reiterates her argument that the undisputed evidence renders it impossible to establish the scienter requirement under the FCA. [DE 143 at 2]. According to Halickman, the credibility of Dr. Halickman and Janet Eick "would only be at issue if their testimony as to crucial material facts were contradicted by other evidence," which is not the case here. *Id.* at 3. Further, to the extent Relator CLJ cites passages of the Medicare Revalidation Application, Halickman argues that they could not have placed Dr. Halickman on notice of fraud, because he was in compliance with them. *Id.* at 4. Thus, Halickman argues Relator CLJ's evidence of the scienter requirement "amounts to nothing more than its unfounded assumptions, unconnected to the evidence it cites." *Id.*

As to deliberate ignorance and reckless disregard, Defendant Halickman argues that neither exist because Dr. Halickman "relied on Ms. Eick, Ms. Clements, and Mr. Lucibella." *Id.* at 5. Moreover, according to Halickman, "Dr. Halickman's reliance on both ACO *and* his own in-house coder, in addition to his inquiries following the allegation of improper incident-to billing amount to far more than 'token efforts,' but are rather genuine good faith efforts to ensure that billing was being done correctly." *Id.* at 7.

Next, with respect to causation, Defendant Halickman argues that she "has not alleged that delegating billing automatically insulates [Dr. Halickman] from the element of causation, but that, under the governing case law, *some* affirmative act on Dr. Halickman's part must have been performed which would satisfy the element of causation; merely owning and operating FPIM is not enough." *Id.* at 9. Turning to accord and satisfaction, Defendant Halickman argues that the defense was not waived, because the agreement "was only revealed during the course of discovery." *Id.* at 11. And finally, Defendant Halickman did not respond to the constitutionality argument regarding *qui tam* actions.

D. Relator CLJ's Motion for Partial Summary Judgment [DE 131]

According to Relator CLJ, "Dr. Jack Halickman submitted false claims to Medicare for years. He billed Medicare for seeing patients when it was his mid-level providers who saw the patients, including at times when those providers were not even enrolled in Medicare. Every time he submitted a false claim to Medicare, he certified that the claim was accurate and in compliance with all applicable rules and regulations. On these simple and indisputable facts, the Court should grant partial summary judgment to Relator." [DE 131 at 1–2]. Relator CLJ therefore argues the Court should enter partial summary judgment in its favor on its three claims.[1] *Id.*

After several pages of background and explanation of key Medicare terminology, Relator CLJ argues that Dr. Halickman presented false or fraudulent claims, and that Dr. Halickman's claims were both factually and legally false. Factually, Relator CLJ argues that from January 1, 2015 through August 31, 2017, Dr. Halickman "submitted or caused to be submitted 5,892

[1] Relator CLJ's motion is partial because Relator CLJ is moving for summary judgment as to only certain of its requested damages. *See* DE 131 at 1 n.1.

claims to Medicare under his Medicare identification number," and that Dr. Halickman disguised the role of Ms. Joyce or Ms. Dubois "by falsely representing in the claims that he provided the services and, to support that, he signed the mid-level providers' claim notes as though he saw the patients." *Id.* at 6. Indeed, during this time period, Dr. Halickman "submitted to Medicare and was reimbursed $697,216.23 in false claims under his PTAN for services he did not render." *Id.* at 7. Moreover, "while incident-to regulations would allow Dr. Halickman, under certain qualifying circumstances, to submit claims for services rendered by NPPs under his direct supervision and incident-to services he previously provided, Dr. Halickman also submitted claims to Medicare under his own PTAN for patient visits he did not directly supervise either." *Id.*

Relator CLJ notes that legally false claims (false certifications) can either be express or implied. *Id.* at 7. In this regard, Relator CLJ argues that Dr. Halickman made express false certifications—that is, certifications that he complied with a law, contract term, or regulation in a claim for federal funds. *Id.* at 7–8. Relator CLJ also argues that Dr. Halickman made implied false certifications—or, that Dr. Halickman "fail[ed] to disclose in a request for payment noncompliance with material legal requirements in a statute, regulation, or contract, thereby rendering the claim a misrepresentation and false and fraudulent." *Id.* at 8.

That being said, Relator CLJ argues that Dr. Halickman acted "knowingly." *Id.* at 10. To this end, Relator CLJ argues Dr. Halickman was not just aware of the fraud, but that he was the architect of said fraud. *Id.* And, "[a]t a minimum, Dr. Halickman acted with deliberate or reckless disregard as to the falsity of his claims for payment." *Id.* at 11.

Relator CLJ further argues that Dr. Halickman's "affirmative defenses are variably inapplicable (third defense), legally deficient (first, second, fifth, and sixth defenses), directly

refuted by the record (fourth defense), or mooted (seventh defense)." *Id.* at 13. Specifically, as to Halickman's first and sixth affirmative defenses—which both assert that Relator CLJ is not the original source of the facts supporting its claims, in part due to the public disclosure rule—Relator CLJ argues that the public disclosure requirement is not met in this case. *Id.* at 13–15. As to Halickman's second affirmative defense, Relator CLJ argues it is a "denial that CLJ satisfied an element of its claims." *Id.* at 16. As to Halickman's third affirmative defense, Relator CLJ argues that none of its claims are based on violations more than six years prior to the filing of this action. *Id.* at 16. As to Halickman's fourth affirmative defense, Relator CLJ argues that the Complaint satisfies Fed. R. Civ. P. 9(b). *Id.* at 16–17. As to Halickman's fifth affirmative defense, Relator CLJ argues that unclean hands is not a defense to liability. *Id.* at 17. And as to Halickman's seventh affirmative defense, Relator CLJ argues that the Court has already ruled on that defense via a May 2, 2023 order denying Halickman's Motion to Dismiss and Quash Service of Process. *Id.*

Turning to damages, Relator CLJ contends that the Government is entitled to judgment as a matter of law and that "[t]he amount paid by the Government as a result of Dr. Halickman's false claims is $697,216.23, which after trebling is $2,091,648.696 not taking into consideration any fines or penalties." *Id.* at 18–19.

E. Defendant Halickman's Response to the Partial MSJ [DE 136]

Defendant Halickman responds that discovery has revealed: (1) that under Medicare, the services of non-enrolled providers can be billed under an enrolled provider's PTAN, incident-to care provided by that enrolled provider; (2) that FPIM was a group practice and there was a physician present and supervising midlevel providers as they performed incident-to services, even on days when Dr. Halickman was not present; (3) that Dr. Halickman did not bill for

wellness visits performed by midlevel providers; and (4) that Dr. Halickman never practiced upcoding. [DE 138 at 2]. That said, Halickman asserts that "[i]f this Court finds that even one of the elements presents a genuine dispute of material fact, it should deny Relator CLJ's Motion for [Partial] Summary Judgment. If the Court finds that any of the elements are *impossible* to prove on the evidence, it should also grant Defendant Halickman's Motion for Summary Judgment and dismiss CLJ's pending action with prejudice." *Id.* at 3.

Next, with respect to Relator CLJ's citation to the applicable law concerning Medicare and incident-to billing, Defendant Halickman argues that Relator CLJ misinterprets 42 CFR Section 410.26, as, although that section "precludes anyone who has had Medicare enrollment *revoked* from billing incident to, it ***does not*** require that such person actually has been enrolled in the first place." *Id.* at 4. Indeed, Halickman argues that the regulations "clearly exonerate Dr. Halickman, and . . . even the group practice as a whole." *Id.* at 5.

As to causation, Defendant Halickman notes that Relator CLJ's motion skips the element in its entirety. *Id.* at 6. According to Halickman, "[n]o reasonable jury could conclude that Dr. Halickman's actions (which consisted solely of hiring qualified billing staff and recording accurate information) would foreseeably result in the submission of a false claim." *Id.* And, "[w]ithout basis, Relator CLJ credits to Dr. Halickman the billing of others and the submission of claims, as if assuming that he prepared and submitted every one of FPIM's bills himself and logged the visit notes of his midlevel providers. Relator CLJ's Motion fails (or does not even try) to prove that Dr. Halickman directed the use or recording of false information, falsified any document himself, or otherwise performed any specific act which would proximately cause the presentation of false billing." *Id.* at 9. In sum, Halickman contends that, "[u]nder Piacentile (supra), actions Dr. Halickman did *not* perform, and passive conditions such as ownership of

FPIM or knowledge of the practices do not suffice to support causation, and no action actually performed by him could have created a foreseeable risk that a false claim would be presented. As such, the element of causation is not met." *Id.* at 9.

In any event, Defendant Halickman argues that material disputes of fact regarding the falsity of the claims at issue remain. *Id.* at 10. Indeed, Halickman argues that Dr. Halickman's claims were not factually false, and that Dr. Halickman's claims were not legally false. *Id.* at 10–12.

Further, Defendant Halickman contends that Relator CLJ cannot prove the scienter requirement. *Id.* at 12. This is because "[n]o reasonable jury could find that Dr. Halickman knew of the fraudulent billing alleged. The evidence has proven that he lacked actual knowledge of fraud, made inquiries into the matter, and actively established appropriate safeguards to ensure that FPIM billed correctly." *Id.* at 12. Moreover, Halickman argues that Dr. Halickman's behavior was inconsistent with deliberate ignorance or reckless disregard. *Id.* at 16. According to Halickman, "[i]t is impossible to find 'deliberate ignorance' or 'reckless disregard' in the act of immediately and persistently investigating to learn the very thing Dr. Halickman was allegedly ignorant about, especially having hired qualified billing experts he invariably deferred to in such matters." *Id.* at 18.

Turning to her affirmative defenses, Defendant Halickman argues they cannot be decided on summary judgment "and would preserve the right to a jury trial, even if Relator CLJ's claims themselves were proven." *Id.* at 17. As to the first and sixth affirmative defenses, Relator CLJ was "not the original source of the claims at issue, because the first public disclosure of its claims was on September 10, 2019," with the state court lawsuit. *Id.* at 19–20. As to the second affirmative defense, Halickman argues that where, "as here, Relator CLJ has failed to prove

scienter, much less beyond its being a genuine dispute of fact, it is not entitled to summary judgment." *Id.* at 20. And as to the fifth affirmative defense, Defendant Halickman argues unclean hands requires adjudication by jury trial. *Id.*

F. Relator CLJ's Reply [DE 146]

Relator CLJ sums up its position as follows:

> CLJ's *Motion for Partial Summary Judgment* rests on a simple and discrete point of law: that providers must be enrolled in Medicare to render services to Medicare patients, whether for incident-to or direct billing. Faced with the undisputed fact that Dr. Halickman's non-physician providers ("NPPs") were not enrolled with Medicare, Mrs. Halickman attempts to paint this simple credentialing requirement as something complex and open to interpretation. It is not. Medicare enrollment is a prerequisite for rendering services, and Relator CLJ is entitled to judgment on this point as a matter of law.

[DE 146 at 1].

Further, Relator CLJ argues that Defendant Halickman "adopts an overly narrow view of causation, ignoring that Dr. Halickman certified FPIM's claims and directed FPIM employees on how to bill." *Id.* at 5. According to Relator CLJ, Halickman "doubles down on the key themes of her defense in this case: using Janet Eick as a shield to Dr. Halickman's misconduct and portraying Dr. Halickman as the hapless, passive owner of FPIM." *Id.* However, the summary judgment evidence "bears out Dr. Halickman's participation in the submission of false claims."

Relator CLJ further argues that Defendant Halickman's response to its argument concerning the falsity element "relies only on self-serving testimony from Dr. Halickman and Janet Eick, and does not even attempt to address the implied false certification theory." *Id.* at 6. And finally, Relator CLJ argues that Defendant Halickman cannot rebut scienter by "pointing the finger at others." *Id.* at 7–9.

## IV. LEGAL STANDARD & ANALYSIS

Federal Rule of Civil Procedure 56(a) states in relevant part that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of demonstrating to the court by reference to the record that there are no genuine issues of material fact that need to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a moving party has discharged its initial burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," identify specific facts showing there is a genuine issue for trial. *Id.* at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences in the light most favorable to the party opposing the motion. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998) (citations and quotations omitted). Any doubts regarding whether a trial is necessary must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

So long as the non-moving party has had an ample opportunity to conduct discovery, the non-movant must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the

opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the nonmoving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

Here, while the parties have filed competing motions for summary judgment, the issues largely overlap. In this regard, the issues for the Court to determine are: (1) whether Dr. Halickman had knowledge of any false record or claim; (2) whether Dr. Halickman was the proximate cause of the false record or claim; (3) whether there was, in fact, a false record or claim in the first instance;[2] (4) whether accord and satisfaction exists in this case; and (5) the propriety of Defendant Halickman's affirmative defenses. The Court will address each issue, in turn, below.

A. <u>FCA Claims</u>

Under the False Claims Act ("FCA") and the claims at issue in the instant case, any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> . . .
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly avoids or decreases an obligation to pay or transmit property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties

[2] These first three determinations pertain to the elements of Relator CLJ's False Claims Act causes of action.

> Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1) (footnote omitted). "To establish a cause of action under the False Claims Act, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *U.S. v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005). The Court begins its analysis with whether Dr. Halickman had knowledge of any false records or claims.

1. <u>Whether Dr. Halickman Had Knowledge of Any False Record or Claim</u>

The FCA defines "knowingly" as pertaining to a person that, with respect to information, (1): "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information[.]" 31 U.S.C. § 3729(b)(1)(A)(i)–(iii). "[K]nowingly" requires no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1)(B). In other words, for purposes of "knowingly" under the FCA statute, it must be established that the person has "either actual knowledge, deliberate ignorance, or recklessness . . . ." *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023).

With respect to "actual knowledge," the term "refers to whether a person is 'aware of' information." *Id.* at 751. "Deliberate indifference" refers to defendants "who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.* And, "reckless disregard" encompasses defendants "who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id.* "The FCA's scienter element refers to respondents' knowledge and subjective

beliefs—not to what an objectively reasonable person may have known or believed." *Id.* at 749. Moreover, "[b]ecause the FCA does not proscribe fraudulent activity in general but rather prohibits the knowing submission of false claims, the requisite knowledge must be proved to exist not at just any time in the course of the parties' interactions but at the point at which a defendant submits its claims for payment." *A1 Procurement, LLC v. Hendry Corp.*, No. 11-23582-CIV, 2013 WL 12065531, at *7 (S.D. Fla. June 26, 2013).

In the instant case, either under "actual knowledge," "deliberate indifference," or "reckless disregard," the Court finds that there exists a genuine issue of material fact as to whether Dr. Halickman *knowingly* presented, caused to be presented, or caused to be made or used, a false or fraudulent record or claim. Specifically, Relator CLJ points to the following evidence to establish Dr. Halickman's scienter under the FCA: (1) that Dr. Halickman set up FPIM's eClinicalWorks program, establishing himself as a rendering provider and billing as if he himself had rendered the services; (2) Dr. Halickman's Medicare Revalidation Application certification; (3) Dr. Halickman's improper reliance upon Ms. Eick for billing procedures; (4) Dr. Halickman's absence from the office on dates where he billed; and (5) the certification language of each claim submitted. *See* DE 141 at 2–6; DE 131 at 10–12.

However, Defendant Halickman disputes that Dr. Halickman set up the eClinicalWorks program and cites record evidence that Dr. Halickman relied upon eClinicalWorks staff to set up the program, thereby creating a genuine issue of material fact as to Dr. Halickman's knowledge of the billing functions of the program. [DE 140 at 3–4 ¶ 23]. Moreover, with respect to the Medicare Revalidation Application certification and to the certification language of each claim submitted, Dr. Halickman testified that he had no knowledge of false and fraudulent billing practices, *see* DE 139 at 6 ¶ 43, and Halickman argues that Dr. Halickman was, in fact,

compliant with the Medicare Revalidation Application and certification language. [Halickman's SMF ¶ 43; Relator's Response SMF ¶ 43; Halickman's Reply SMF ¶ 43]. In fact, the parties argue competing interpretations of incident-to billing practices (which, as stated below, is an issue of fact for the jury to determine). *See* DE 143 at 4.

Third, as to Dr. Halickman's purported improper reliance upon Ms. Eick, the parties dispute whether Ms. Eick spoke with Dr. Halickman about billing practices, relying upon separate portions of Ms. Eick's deposition. Defendant Halickman argues that Ms. Eick testified that Dr. Halickman asked her twice whether FPIM was billing incident-to correctly, while Relator CLJ argues that Ms. Eick never spoke with Dr. Halickman about billing practices. *See* Halickman's SMF ¶ 44; Relator's Response SMF ¶ 44; Halickman's Reply SMF ¶ 44. Moreover, the parties dispute Ms. Eick's status as a billing specialist, and her role in billing and credentialing. [Halickman's SMF ¶¶ 25–26; Relator's Response SMF ¶¶ 125–26; Halickman's Reply SMF ¶¶ 25–26]. These disputes necessarily affect whether Dr. Halickman had actual knowledge of any false or fraudulent records or claims, and whether Dr. Halickman acted with deliberate indifference or reckless disregard in relying upon Ms. Eick for billing purposes.

Fourth, with respect to Dr. Halickman's absence from the office on dates in which he billed, the parties dispute whether Dr. Halickman submitted claims under his credentials on days when he was not in FPIM's office. [Relator's SMF ¶ 41; Halickman's Response SMF ¶ 41]. Indeed, to the extent Relator CLJ specifically points to October 3, 2016 as an example of such fraudulent billing practices, that specific date, too, is in dispute. [Relator's SMF ¶ 42; Halickman's Response SMF ¶ 42]. As noted by Defendant Halickman, "[w]hether Dr. Halickman's memory is more reliable than (Relator's interpretation of) medical records from 2016 is a clear dispute of fact." [Halickman's Response SMF ¶ 42].

Accordingly, as to "actual knowledge," "deliberate indifference," and "reckless disregard," the Court finds that there exists a genuine issue of material fact with respect to Dr. Halickman's knowledge under the FCA. Consequently, Defendant Halickman's Motion for Summary Judgment [DE 125] and Relator CLJ's Motion for Partial Summary Judgment [DE 131] are due to be DENIED.

2. Whether Dr. Halickman Was the Proximate Cause of the False Record or Claim

For "cause[] to be presented" claims under 31 U.S.C. § 3729(a)(1)A, "proximate causation is a useful and appropriate standard by which to determine whether there is a sufficient nexus between the defendant's conduct and the submission of a false claim." *Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020). Indeed, "courts have applied traditional concepts of proximate causation 'to determine whether there is a sufficient nexus between the Defendants' conduct and the ultimate presentation of the allegedly false claim.'" *United States v. Marder*, 208 F. Supp. 3d 1296, 1313 (S.D. Fla. 2016) (quoting *United States v. Abbott Labs.*, No. 06-CV-1769-M, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016)); *see also United States ex rel. Hartley v. Hosp. Auth. of Valdosta & Lowndes Cnty., Ga.*, No. 21-CV-72 (HL), 2023 WL 6702483, at *13 (M.D. Ga. Oct. 12, 2023) (applying proximate causation to a "cause[] to be made or used" False Claims Act claim). Under a proximate cause analysis, "a defendant's conduct may be found to have caused the submission of a claim for Medicare reimbursement if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Ruckh*, 963 F.3d at 1107 (quoting *Marder*, 208 F. Supp. 3d at 1312–13)).

Here, Relator CLJ essentially argues that Dr. Halickman was the "architect" of the fraud, perpetuating the submission of false claims by: (1) teaching Ms. Joyce how to code her patient visits; (2) signing all non-physician providers' patient visit notes even when he did not see the patients; (3) billing for 24–28 hours' worth of patient encounters per day; (4) having mid-level providers render care to Medicare beneficiaries despite not being enrolled with Medicare; (5) submitting claims under his credentials on days when he was not in the office; and (6) being Ms. Eick's direct and only supervisor prior to FPIM's purchase by Relator CLJ. [DE 146 at 5–6].

However, the parties are in dispute over whether Dr. Halickman taught Ms. Joyce or his staff how to code patient visits. [Relator's SMF ¶ 12; Halickman's Response SMF ¶ 12]. Moreover, the parties dispute whether Dr. Halickman billed for 24–28 hours' worth of patient encounters per day, with Defendant Halickman asserting that "Relator appears . . . to be counting midlevels using his PTAN as [Dr.] Halickman['s] reporting time" and "[m]ore credible witness testimony refutes that [Dr.] Halickman had anything to do with how midlevel providers were billed, . . . and refutes that this amounts to a representation that Dr. Halickman himself provided these services." [Relator's SMF ¶ 30; Halickman's Response SMF ¶ 30]. And, as stated earlier, with respect to Dr. Halickman's absence from the office on dates in which he billed, the parties dispute whether Dr. Halickman submitted claims under his credentials on days when he was not in FPIM's office. [Relator's SMF ¶ 41; Halickman's Response SMF ¶ 41].

Further, while Halickman admits that Dr. Halickman signed all non-physician providers' patient notes even when he did not see the patients and that Dr. Halickman had mid-level providers render care to Medicare beneficiaries despite not being enrolled with Medicare, *see* Relator's SMF ¶¶ 25 & 37; Halickman's Response SMF ¶¶ 25 & 37, Halickman disputes that Dr. Halickman submitted Medicare claims as though he himself had provided services to the

patients. [Relator's SMF ¶ 37; Halickman's Response SMF ¶ 37]. Moreover, it is Defendant Halickman's position that mid-level resource providers could examine/treat patients and bill the service under the NPI number of a physician provider. [Halickman's SMF ¶ 28; Relator's Response SMF ¶ 28; Halickman's Reply SMF ¶ 28]. In other words, there exists a genuine issue of material fact as to whether or not it was *Dr. Halickman* himself that was the cause of the false claims being submitted. Accordingly, Defendant Halickman's Motion for Summary Judgment [DE 125] and Relator CLJ's Motion for Partial Summary Judgment [DE 131] are due to be DENIED on this issue.

3. Whether There Is a False or Fraudulent Record or Claim

"Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005)). "There are two types of false or fraudulent claims that may be alleged by plaintiffs pursuing presentment or make-or-use claims under the False Claims Act: factually false claims and legally false claims." *United States ex rel Phalp v. Lincare Holdings, Inc.*, 116 F. Supp. 3d 1325, 1344 (S.D. Fla. 2015), *aff'd as modified*, 857 F.3d 1148 (11th Cir. 2017). "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *United States ex rel. Watt v. VirtuOx, Inc.*, No. 19-61084-Civ, 2021 WL 3883944, at *4 (S.D. Fla. Aug. 31, 2021) (quoting *United States v. Space Coast Med. Assocs., L.L.P.*¸94 F. Supp. 3d 1250, 1259 (M.D. Fla. 2015)). "Legally false claims, otherwise known as false certifications, can 'be either express

or implied.'" *Marder*, 208 F. Supp. 3d at 1312 (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010)).

Express certification "involves a provider's explicitly certifying compliance with applicable law and regulations as part of the claims-submission process." *VirtuOx, Inc.*, 2021 WL 3883944, at *6. "Implied certification, on the other hand, implicates a provider's submitting claims for payment when they knowingly violated a law, rule, or regulation which was a condition for receiving payment from the Government." *Id.* Stated differently, "the implied certification theory can be a premise of liability at least where a party, in requesting payment, makes certain representations which are misleading because of the omission of violations of statutory, regulatory, or contractual requirements[.]" *Marsteller for use & benefit of United States v. Tilton*, 880 F.3d 1302, 1313 (11th Cir. 2018).

Turning then to the applicable Medicare law, "[t]o receive payment for covered Medicare items or services from either Medicare . . . or a Medicare beneficiary[,] . . . a provider or supplier must be enrolled in the Medicare program." 42 C.F.R. § 424.505. "Medicare Part B pays for services and supplies incident to the service of a physician (or other practitioner)." 42 C.F.R. § 410.26(b). In this regard,

> In general, services and supplies must be furnished under the direct supervision of the physician (or other practitioner). Designated care management services can be furnished under general supervision of the physician (or other practitioner) when these services or supplies are provided incident to the services of a physician (or other practitioner). Behavioral health services can be furnished under general supervision of the physician (or other practitioner) when these services or supplies are provided by auxiliary personnel incident to the services of a physician (or other practitioner). The physician (or other practitioner) supervising the auxiliary personnel need not be the same physician (or other practitioner) who is treating the patient more broadly. However, only the supervising physician (or other practitioner) may bill Medicare for incident to services.

42 C.F.R. § 410.26(b)(5).

"General supervision" means "the service is furnished under the physician's (or other practitioner's) overall direction and control, but the physician's (or other practitioner's) presence is not required during the performance of the service." 42 C.F.R. § 410.26(a)(3). "Direct supervision" means "the physician (or other supervising practitioner) must be present in the office suite and immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed." 42 C.F.R. § 410.32(b)(3)(ii). And, "auxiliary personnel" means:

> any individual who is acting under the supervision of a physician (or other practitioner), regardless of whether the individual is an employee, leased employee, or independent contractor of the physician (or other practitioner) or of the same entity that employs or contracts with the physician (or other practitioner), has not been excluded from the Medicare, Medicaid and all other federally funded health care programs by the Office of Inspector General or had his or her Medicare enrollment revoked, and meets any applicable requirements to provide incident to services, including licensure, imposed by the State in which the services are being furnished.

42 C.F.R. § 410.26(a)(1). The official Centers for Medicare & Medicaid Services website states that: "[t]o provide care to Medicare patients, enroll in the Medicare Program. You must enroll if you're a participating nonphysician practitioners [sic] or you bill services directly under your NPI or as a supervising physician or nonphysician practitioner who bills for 'incident to' services." [DE 129–2].

Here, in further explanation of this body of law, Defendant Halickman has provided the expert report of Sean Weiss, wherein he states as follows:

> So, what exactly are Incident-To Services? In the Medicare billing context, the term ***"Incident To"*** refers to the fact that under certain circumstances, the services of non-physician, mid-level practitioners (such as Nurse Practitioners (NPs) and Physician Assistants (PAs)) are ***". . . furnished as an integral, although incidental, part of the physician's personal professional services in the***

> ***course of diagnosis or treatment of an injury or illness."*** Simply stated, as long as the various requirements mandated by Medicare have been met, the "incident to" services performed by mid-level practitioners can be billed as if the services were performed by the practitioner's supervising physician, under the physician's National Provider Identifier (NPI). Unfortunately, "incident to" billing practices remain a challenge for many health care practices around the country. It has been more than been 45 years since legislation was first enacted permitting NPs and PAs to bill Medicare for their services if they were performed incident to a physician's professional services. While this initial billing authorization of NP and PA services was quite limited, it has significantly expanded over the years.

[DE 129-1 at 4] (footnotes omitted). Thereafter, following his discussion of incident-to services, Mr. Weiss ultimately opines that: (1) nurse practitioners and physician assistants fall within the definition of "auxiliary personnel"; (2) "auxiliary personnel providing services 'incident to' ***may or may not*** be required to be credentialed with CMS and have a NPI number"; (3) the services rendered incident-to "are permitted to be billed under the supervising physician['s] NPI number"; and (4) CMS did not sustain any damages as a result of FPIM's incident-to billing practice. *Id.* at 11.

Based on Mr. Weiss' expert report and certain testimony from Dr. Halickman, Ms. Eick, and Ms. Joyce, Defendant Halickman contends that discovery has shown that, "[u]nder Medicare Rules, the services of non-enrolled providers *can* be billed under an enrolled provider's PTAN, incident to care provided by that enrolled provider[,]" that "FPIM was a group practice and there was a physician present and supervising midlevel providers as they performed incident to services, even on days when Dr. Halickman was not present physically[,]" and that Dr. Halickman "did not bill for wellness visits performed by midlevel providers."[3] *See* DE 138 at 2. While Mr. Weiss' expert opinion is the subject of a pending *Daubert* motion based upon his opinion that auxiliary personnel providing incident-to services "may or may not" be required to

[3] Defendant Halickman also argues that discovery has shown that Dr. Halickman did not practice upcoding. However, Relator CLJ has acknowledged that its claims are not based on upcoding.

be credentialed with CMS and have an NPI number, the Court will be entering an Order in the very near future denying the *Daubert* challenge to Mr. Weiss.

For all the above reasons, there necessarily exists a genuine issue of material fact as to whether there are factually or legally false or fraudulent records or claims in this case. Indeed, while Relator CLJ argued during the March 28, 2024 hearing that the interpretation of the Medicare regulations and CMS policies are an issue of law for the Court to determine, Defendant Halickman instead argued that they are issues of fact. Because this case involves a jury trial, and because one of the main elements of a False Claims Act cause of action is whether there is a false or fraudulent record or claim, the Court finds that whether Dr. Halickman billed correctly under incident-to requirements is an issue for the trier of fact to determine. Accordingly, Defendant Halickman's Motion for Summary Judgment [DE 125] and Relator CLJ's Motion for Partial Summary Judgment [DE 131] are due to be DENIED on this issue.

B. <u>Accord and Satisfaction</u>

Defendant Halickman specifically argues the following with respect to Accord and Satisfaction:

> In December of 2020, FPIM, by and through administrative staff and their counsel, made a self-report to CMS of potential overpayments by FPIM, (See **Exhibit "15"**, letter to First Coast Service Options) including those alleged in the present action, and issuing a check for $185,076.65 in repayment of these amounts. (See **Exhibit "15"**, check issued by FPIM in repayment of alleged overpayments). In response to FPIM's December 7, 2020 offer of repayment **(Exhibit "15"),** First Coast Options requested an additional amount of $20,457.59 which, on information and belief, was subsequently withdrawn, and the matter settled for $185,076.65.
>
> Because FPIM has already paid to CMS the total amount that First Coast Service Options identified as due, it has reached accord and satisfaction as of the date of the second payment. CMS possesses the authority to resolve contract disputes with providers, including overpayments. 42 CFR § 405.376. CMS thus acted within the scope of its statutory authority when it obtained accord and satisfaction of FPIM

> for the overpayments which are the subject of the present action. Accordingly, all claims post 09/01/2017 (date of sale) should be dismissed for the reasons stated above.

[DE 125 at 18].

In response, and as briefly stated earlier, Relator CLJ argues that Halickman's accord and satisfaction is an unpled affirmative defense. [DE 141 at 9]. Relator CLJ also argues that Halickman does not satisfy the elements of an accord and satisfaction claim. *Id.* And, Relator CLJ argues that Halickman's accord and satisfaction argument is inapplicable to the bulk of Relator CLJ's claims. *Id.* at 9–10.

In reply, Defendant Halickman contends that the accord and satisfaction defense "was not waived in its answer, because . . . the agreement was only revealed during the course of discovery." [DE 143 at 11]. Halickman therefore argues that she "should be granted leave to amend [her] Answer to include it." *Id.* Halickman further argues that the elements of an accord and satisfaction defense are met, because "CLJ satisfied CMS's claims against it in its capacity as owner of FPIM, the same capacity in which it alleges Dr. Halickman's supposed fraud was performed." *Id.*

First, the Court notes that, after Defendant Halickman filed her Response—in which she stated that she "should be granted leave to amend"—Halickman filed a Motion for Leave to File Amended Affirmative Defenses [DE 151]. As part of that motion, however, Halickman did not request leave to assert an accord and satisfaction affirmative defense. Rather, Halickman requested leave to assert two *separate* affirmative defenses. *See* DE 151 at 4. Thus, to the extent Halickman's accord and satisfaction defense was *not* previously waived, the Court finds that Halickman's actions in later requesting leave to amend and again omitting accord and satisfaction as an affirmative defense constitute waiver.

Second, "the accord and satisfaction defense require[s] proof of two elements: First, that the parties mutually intended to settle an existing dispute by entering into a superseding agreement; and, second, that there was actual performance with satisfaction of the new agreement discharging [a party's] prior obligation." *United States v. Morrison*, 28 So. 3d 94, 100–01 (Fla. 1st DCA 2009).[4] Under the False Claims Act, an action "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." 31 U.S.C. § 3730(b).

Here, even assuming the propriety of the parties' citation to *Morrison*, Defendant Halickman necessarily cannot establish that the parties "mutually intended to settle [the] existing dispute," as it is the *Attorney General* that must give written consent to the dismissal. 31 U.S.C. § 3730(b). Moreover, the evidence upon which Halickman relies upon for her unpled accord and satisfaction defense is simply a letter dated December 7, 2020, from a law firm to First Coast Service Options concerning a "Voluntary Refund of Monies." [DE 126-15]. Halickman has pointed to no record evidence even remotely establishing that this letter constitutes a mutual intent to settle the existing dispute. *See Morrison*, 28 So. 3d at 100–01.

And third, the Court notes that Defendant Halickman has failed to respond to Relator CLJ's argument that the accord and satisfaction defense "does not apply to the bulk of Relator's claims in any event." *See* DE 141 at 9–10. Consequently, the Court finds that Halickman's Motion for Summary Judgment [DE 125] is due to be DENIED as to accord and satisfaction.

[4] Both parties cite to *Morrison*, despite this being a claim involving the federal False Claims Act.

C. Affirmative Defenses

1. First Affirmative Defense

Defendant Halickman's First Affirmative Defense is that Relator CLJ's claims are barred by the public disclosure rule. [DE 77 at 7]. However, Defendant Halickman has withdrawn the First Affirmative Defense following the March 28, 2024 hearing on the motions for summary judgment. [DE 170 at 2]. Accordingly, the Court finds that Relator CLJ's Motion for Partial Summary Judgment [DE 131] is due to be GRANTED with respect to the First Affirmative Defense.

2. Second Affirmative Defense

Defendant Halickman's Second Affirmative Defense is as follows: "To the extent billing practice(s) were not 100% compliant with federal billing regulations, said difference[s] were mere errors and lacked the knowledge component. Defendant did not knowingly fail to properly submit demands for payment to CMS." [DE 77 at 8; DE 170 at 2]. However, "merely labeling what is otherwise a denial of an element of plaintiff's prima facie case as an affirmative defense does not preclude the entry of summary judgment." *Marder*, 208 F. Supp. 3d at 1318. Indeed, as stated earlier, "[t]o establish a cause of action under the False Claims Act, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *R&F Props.*, 433 F.3d at 1355.

Here, knowledge is a main element of Relator CLJ's three False Claims Act causes of action. Thus, the argument that Dr. Halickman had no knowledge concerning the proper submission of demands for payment to CMS has no basis as an affirmative defense. *See Marder*, 208 F. Supp. 3d at 1318. Rather, the Court shall treat it as a denial. The Court therefore finds that

Relator CLJ's Motion for Partial Summary Judgment [DE 131] is due to be GRANTED with respect to the Second Affirmative Defense.

3. Third Affirmative Defense

Defendant Halickman's Third Affirmative Defense is that some of Relator CLJ's claims are barred by the statute of limitations. [DE 77 at 8]. However, Defendant Halickman has withdrawn the Third Affirmative Defense following the March 28, 2024 hearing on the motions for summary judgment. [DE 170 at 2]. Accordingly, the Court finds that Relator CLJ's Motion for Partial Summary Judgment [DE 131] is due to be GRANTED with respect to the Third Affirmative Defense.

4. Fourth Affirmative Defense

Defendant Halickman's Fourth Affirmative Defense is that Relator's claims "are barred as the Complaint does not adhere to the pleadings standards set forth in Fed. R. Civ. P. 9(b)." [DE 77 at 8; DE 170 at 2]. However, Defendant Halickman has withdrawn the Fourth Affirmative Defense following the March 28, 2024 hearing on the motions for summary judgment. [DE 170 at 2]. Accordingly, the Court finds that Relator CLJ's Motion for Partial Summary Judgment [DE 131] is due to be GRANTED with respect to the Fourth Affirmative Defense.

5. Fifth Affirmative Defense

Defendant Halickman's Fifth Affirmative Defense is unclean hands. Defendant Halickman argues that "Relator participated in alleged similar acts after the sale of the company, from September 1, 2017, through May 2019 condoning the alleged actions taken of Defendant. The [R]elator is the wrongdoer and is not entitled to any award any/or attorney's fees if the

action is successful. Relator continued the alleged practice for almost two years." [DE 77 at 8; DE 170 at 3].

As stated by the court in *Ruscher v. Omnicare Inc.*, No. 08-CV-3396, 2014 WL 5364152 (S.D. Tex. Oct. 21, 2014), "[n]either the False Claims Act itself nor the Fifth Circuit has directly resolved whether a defendant can rely on a relator's unclean hands to defend a False Claims Act suit." *Id.* at *2. Nor, apparently, has the Eleventh Circuit. In any event, "the statute does provide that a prevailing relator's share of the proceeds may be reduced if she was a participant in the underlying wrongdoing." *Id.* (citing 31 U.S.C. § 3730(d)(3)). And, "[t]his strongly suggests that a relator's unclean hands are not a bar to a defendant's liability, but only to the relator's eventual award." *Id.*

While this authority is persuasive and logical, the Court declines at this juncture to "break new ground" and find that Relator CLJ's unclean hands are not an absolute bar to Defendant Halickman's liability. *See* DE 138 at 20. Given the dearth of authority on the issue, the Court finds that this is not a matter properly decided on summary judgment at this time. Accordingly, the Court finds that Relator CLJ's Motion for Partial Summary Judgment [DE 131] is due to be DENIED with respect to the Fifth Affirmative Defense at this time. This ruling is without prejudice to Relator CLJ's ability to renew its argument during trial or pursuant to any Rule 50(a) motion.

6. <u>Sixth Affirmative Defense</u>

Defendant Halickman's Sixth Affirmative Defense is that the "Relator is not the original source. If an original source exists, it would be the subsequent purchasers of the clinic after Relator sold the clinic or the persons who conducted the due diligence investigation and identified the alleged billing errors." [DE 77 at 8; DE 170 at 3].

> Pursuant to 31 U.S.C. § 3730(e)(4):
>
> (e) Certain Actions Barred.—
>
> . . .
>
> (4) (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media,
> >
> > unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(A)–(B) (footnote omitted).

Here, in arguing that Relator CLJ is not the original source, it appears that Defendant Halickman is mostly proceeding under 31 U.S.C. § 3730(e)(4)(A)(iii) rather than under subsections (i) and (ii). *See* DE 138 at 19. Under subsection (iii), "[t]he Court shall dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . *from the news media*, . . . unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A)(iii) (emphasis added).

In response to Defendant Halickman's argument, Relator CLJ cites a number of cases standing for the proposition that the FCA was amended to *exclude* state court cases from section 3730(e)(4)(a). *See, e.g.*, *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) ("Before the 2010 amendments to the FCA, information disclosed in both federal and state court proceedings was considered publicly disclosed. . . . After the 2010 amendments, only information disclosed in federal court proceedings may be considered public disclosures.") (internal citation omitted). Relator CLJ further cites several cases for the proposition that courts "have rejected arguments that a website qualifies as news media where the information related to the subject claims is obtainable only by following several steps." [DE 131 at 15] (citing *United States ex rel. Liotine v. CDW Gov't, Inc.*, No. 05-33-DRH, 2009 WL 3156704 (S.D. Ill. 2009), and *United States ex rel. Repko v. Guthrie Clinic, P.C.*, No. 04cv1556, 2011 WL 3875987 (M.D. Pa. Sept. 1, 2011)).

While Defendant Halickman responds to Relator CLJ's citation to *Liotine* and *Repko*, Halickman does not address *Osheroff* or the amendment to the FCA to exclude state court cases. This is likely for good reason. Previously, 31 U.S.C. § 3730(e)(4) provided as follows:

> (4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)–(B) (2009) (footnote omitted). It would be absurd for the Legislature to amend the False Claims Act to directly exclude state court cases, and to then indirectly include

state court cases because of the existence of a state court docket (which Halickman essentially argues constitutes some sort of public disclosure through "news media" since a state court docket is available online). The Court wholly rejects such an assertion, and there has been no public disclosure here pursuant to that statutory provision. Moreover, to the extent that Halickman also argues that Relator CLJ is not the original source of the claims at issue because of an additional September 10, 2019 lawsuit, the same reasoning would apply. The existence of a state court action simply cannot implicate 31 U.S.C. § 3730(e)(4), as a state court docket is not part of any news media.

Finally, to the extent Defendant Halickman argues that certain information was disclosed in a non-confidential settlement between FPIM and First Coast Service Options, and that the "public record settlement" constitutes a Federal Report for purposes of 31 U.S.C. § 3730(e)(4)(A)(ii), the Court also rejects such an assertion. Defendant Halickman bases her argument on DE 126-15, which is a letter dated December 7, 2020, from a law firm to First Coast Service Options concerning a "Voluntary Refund of Monies." [DE 126-15]. However, Halickman cites no basis in law or fact to establish that the December 7, 2020 letter was some sort of "Federal report" under the False Claims Act statute.

Accordingly, the Court finds that Relator CLJ's Motion for Partial Summary Judgment [DE 131] is due to be GRANTED with respect to the Sixth Affirmative Defense.

7. Seventh Affirmative Defense

Defendant Halickman's Seventh Affirmative Defense is that she was not properly served and the Court therefore lacks personal jurisdiction. [DE 77 at 9; DE 170 at 3]. However, on May 2, 2023, the Court issued an Omnibus Order [DE 74], in which it denied Halickman's Motion to Dismiss and Quash Service of Process [DE 54]. Thus, the Court has already ruled on Defendant

Halickman's Seventh Affirmative Defense. The Court therefore finds that Relator CLJ's Motion for Partial Summary Judgment [DE 131] is due to be GRANTED with respect to the Seventh Affirmative Defense.

## V. CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Halickman's Motion for Summary Judgment [DE 125] is **DENIED**, and that Relator CLJ's Motion for Partial Summary Judgment [DE 131] is **GRANTED IN PART AND DENIED IN PART**, as stated herein.[5] The Court is aware that the parties' respective supplemental motions for summary judgment [DEs 162, 165] are still pending and the parties are advised that a ruling on those motions shall be issued in the very near future.

This case shall proceed to jury trial on the remaining claims and affirmative defenses at 9:00 a.m. on July 29, 2024, and the parties and their counsel are directed be personally present in court at the West Palm Beach Federal Courthouse, Courtroom 2, Fourth Floor, at 8:30 a.m. on July 29, 2024. The calendar call shall be held at 2:00 p.m. on July 24, 2024, at the West Palm Beach Federal Courthouse, Courtroom 2, Fourth Floor. All counsel must appear in person at the calendar call.

[5] Further, to the extent that Defendant Halickman argues that 31 U.S.C. § 3730(b)(4)(B) "so far as it authorizes a private litigant to maintain a qui tam action in which the United States has declined to intervene, is unconstitutional[,]" DE 125 at 18–19, Halickman's position is directly refuted by the law. While Halickman cites from Justice Thomas' dissent in *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419 (2023), for her assertion, Justice Kagan's majority opinion from that same case provides that, "[f]rom the start, the FCA has been enforced through a unique public-private scheme. Federal prosecutors may of course sue an alleged violator, all on their own. *See* 31 U.S.C. § 3730(a). But private parties—again, relators—may also sue, in so-called *qui tam* actions." *Polansky*, 599 U.S. at 424.

**ORDERED AND ADJUDGED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 14th day of June, 2024.

WILLIAM MATTHEWMAN
United States Magistrate Judge